UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| Michael Lambert,<br><br>                              Plaintiff,<br><br>     v.<br><br>Environmental Restoration Group, Inc.,<br>Malcolm Pirnie, Inc., and Molycorp, Inc.,<br><br>                             Defendants. | **Civil Action No.**<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW the PLAINTIFF, Michael Lambert, who in support of his COMPLAINT, respectfully avers as follows:

1. Plaintiff, Michael Lambert, is an adult individual who resides at 4 Stonegate Drive, Burgettstown, PA 15021. Lambert is and was at all times relevant hereto a resident of the Commonwealth of Pennsylvania.

2. Defendant Environmental Restoration Group, Inc. ("ERG") is a consulting firm with its principal place of business located at 8809 Washington Street, NE, Suite 150, Albuquerque, New Mexico. At all relevant times, ERG employed Plaintiff to perform work at a remediation project located at 1217 West Wayne Street Washington, PA 15301 (hereinafter "Washington Project"). The President of ERG is Dr. Ken Baker.

3. Defendant Molycorp, Inc. ("Molycorp") is a corporation with its principal place of business located at 116 Inverness Drive East, # 207, Englewood, CO, 80112. At all relevant times hereto, Molycorp was the owner of the Washington Project located at 1217 West Wayne Street Washington, PA 15301, licensed by the U.S. Nuclear

Regulatory Commission (NRC), which was contaminated with radioactive material from past Molycorp business operations. Molycorp contracted with Malcolm Pirnie, Inc. and Shaw Environmental & Infrastructure, Inc. to remediate the Washington, PA project site with the goal of terminating the NRC license through removal of radioactive contamination to a level previously agreed to by the NRC and Molycorp.

4. Defendant Malcolm Pirnie, Inc. ("Malcolm Pirnie") is a New York corporation with its principal place of business in New York, and which operates several businesses, one of which is located at 1603 Carmody Court, Suite 403, Sewickley, PA 15143. At all relevant times, Malcolm Pirnie entered into an agreement with Molycorp, Inc. in connection with a remediation project located in Washington, Pennsylvania. Malcolm Pirnie contracted with ERG to assist it with its contractual obligations as to Molycorp's remediation project.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the opposing parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

6. The events or occurrences giving rise to the claims in this case occurred in Washington County, PA., as ERG wrongfully terminated Lambert in Washington County, PA, and Molycorp and Malcolm Pirnie tortiously interfered with Lambert's employment with ERG in Washington County, PA.

7. Pursuant to 28 U.S.C.A. § 1391(b) venue is proper in United States District Court, Western District of Pennsylvania, Pittsburgh Division.

## FACTS

8. Lambert has over twenty-seven (27) years of experience in environmental protection, health physics and occupational safety and health, is a former member of the National Registry of Radiological Protection Technologists, is an active Certified Health Physicist and current member of the American Board of Health Physics (ABHP), the Health Physics Society, and has participated on the ABHP Part II Panel of Examiners.

9. In December of 2005, Lambert responded to an advertisement for employment with ERG for a position located in Pennsylvania.

10. Lambert contacted ERG and interviewed with Dr. Ken Baker, president of ERG.

11. Dr. Baker discussed the position which would be located in Washington, Pennsylvania and also expressed to Lambert that he wanted his new hire to eventually open an ERG office to cover the eastern part of the United States.

12. A few days later, Lambert received an offer letter from ERG. Lambert accepted the offer of employment with ERG based upon discussions with Dr. Baker about the long-term employment opportunity. Lambert agreed to relocate himself and his family to Pennsylvania.

13. In January of 2006, Lambert began working for ERG.

14. At all relevant times hereto, ERG was subcontracted to Malcolm Pirnie which in turn contracted with Molycorp to perform remediation at Molycorp's Washington Project site at 1217 West Wayne Street Washington, PA 15301.

15. Shaw Environmental & Infrastructure, Inc., (hereinafter "Shaw") was a contractor of Molycorp and was also involved in the removal and disposal of contaminated and uncontaminated materials from the site.

16. The objective of the remediation was to remove radioactively contaminated soil and building debris in accordance with an NRC approved "decommissioning plan," with the primary objective of cleaning up the site and terminating Molycorp's source material license issued by the NRC.

17. This involved the excavation, and removal off-site of material containing elevated levels of radioactivity, and to restore the property for potential commercial or industrial re-use.

18. The remediation was anticipated to be completed in 2008.

19. Lambert worked as an Assistant Radiation Safety Officer ("Assistant RSO") at the Washington, PA site.

20. Contractually, Lambert reported to Dr. Alan Shuckrow, Project Manager for Malcolm Pirnie.

21. From an operational perspective, Lambert reported to Mr. George Dawes, the Molycorp Radiation Safety Officer (RSO) and Molycorp Assistant Project Manager.

22. As the Assistant RSO, Lambert had full responsibility for the development and implementation of the occupational radiation protection program required by the Molycorp NRC license and Title 10 Code of Federal Regulations parts 19, 20, 30, and 40.

23. While working at the Washington, PA site, Lambert informed the Molycorp Project Manager, Jack Wright, Molycorp Assistant Project Manager and RSO, George Dawes, Malcolm Pirnie Project Manager, Dr. Alan Shuckrow, Malcolm Pirnie Site

a. An active trench well over six feet in depth, with evidence of personnel access, but without any of the safety precautions stipulated in 29 CFR 1926, Subpart P;

b. Personnel allowed to enter a confined space below truck scales without atmospheric monitoring performed prior to personnel access, with no ventilation, and with no personnel emergency retrieval systems in place;

c. The Malcolm Pirnie, Inc. Site Safety Officer, Chuck Beatty, repeatedly stood on the edge of an open excavation within a posted radiological area, in close proximity to excavation machinery, and within the "swing radius" of the excavation equipment bucket, without notifying the equipment operator of his position, and in a location where his position was blocked from view by the operator;

d. The Malcolm Pirnie, Inc. Site Safety Officer, Chuck Beatty, obtained a liquid sample from on open excavation within a posted radiological area in an open top container (kitchen measuring cup) for the purpose of identifying the "unknown" hazardous constituents, but prior to determination of the potential hazardous constituents, placed the sample up to his nose to "sniff" while laughing;

e. The Malcolm Pirnie, Inc. Site Safety Officer, Chuck Beatty, received delivery of a moisture density gauge (Troxler gauge) containing a radioactive source without prior authorization and without inspection upon receipt. Lambert found the gauge transport package was damaged, necessitating completion of radiological surveys within a time frame specified by NRC regulation and Site procedures. Since there was no prior knowledge of the gauge purchase or expected delivery, necessary radiological survey equipment was not present on the Molycorp project site and the NRC required radiological surveys were not performed within the designated timeframe, which was in violation of NRC regulations;

f. Removable radioactive surface contamination was discovered in the work area during installation of sheet pile, necessitating posting the work area as a "Contamination Area," briefing of workers concerning the presence of

5

       removable radioactive contamination, and stricter contamination control measures. A Malcolm Pirnie employee directed that workers not be told about hazards such as this (radioactive contamination) because it would "scare them and they would ask for more money";

    g. Shaw Project Manager, Charles Magilson, directed Todd Moore, Shaw Project Foreman, to gather and transport potentially radioactive scrap metal (debris) from the Molycorp project site to a recycler without prior approval from the Molycorp RSO or Lambert; and

    h. Malcolm Pirnie personnel collected radioactive soil samples from within posted radioactive material areas without the proper equipment. Malcolm Pirnie Project Manager, Dr. Alan Shuckrow, directed the samples be transported to an off-site laboratory despite their potential radioactive content and without determining whether the samples in the transport package (cooler) were subject to the U.S. Department of Transportation (DOT) regulations, incorrectly indicating the samples were exempt from DOT regulations since they were "environmental" samples.

24. In each case, Lambert reported the safety violation to a Shaw, Molycorp, or Malcolm Pirnie representative.

25. Lambert's reports resulted in multiple work stoppages. In fact, shortly after site activities began, Lambert stopped three jobs within two days for serious safety concerns and imminent hazard situations.

26. The Molycorp Project Management Team, comprised of managers from Shaw, Molycorp, and Malcolm Pirnie, routinely ignored Lambert's safety reports, failed to correct the underlying cause(s) of the safety infractions and/or displayed hostility to him for bringing the matters to its attention and to the NRC's attention.

27. In particular, Molycorp Project Manager, Jack Wright, told Lambert specifically not to contact the NRC regarding project issues and Malcolm Pirnie Site Safety Officer, Chuck Beatty, on one occasion told Lambert that "he'd hate to be in [Mr. Lambert's] shoes if [he] slowed this project down."

6

28. On May 6, 2006, Dr. Baker performed an internal audit of Lambert's Health Physics program and found it to be excellent. However, he indicated that the site project managers were displeased with Lambert's reports of safety violations and suggested that Lambert try to be less involved with occupational safety issues at the site.

29. Lambert informed Dr. Baker that he could not ignore safety issues and potentially hazardous work situations.

30. On May 11, 2006, Lambert sent an email to the NRC requesting guidance concerning the limits for release of radioactive material to the general public. Lambert's email followed his expressions of concern to Molycorp, Malcolm Pirnie and Shaw over Molycorp's proposed process and plan to release over 2000 tons of potentially hazardous concrete from the project site.

31. Jack Wright, Project Manager for Molycorp, chastised Lambert for sending the email and instructed him not to contact the NRC again for any reason.

32. Wright's action is a violation of NRC regulation, Title 10 CFR Part 19, which encourages communication with the NRC and prohibits employers from taking actions against employees for making such communication. Lambert reported Wright's actions (in violation of 10 CFR 19) in this regard to the NRC.

33. On July 5, 2006, after learning that the site managers planned to transport potentially hazardous soil samples over public highway without screening them to determine if the material was Class 7 hazardous material per Department of Transportation ("DOT") regulations, Lambert informed the Malcolm Pirnie project manager, Dr. Alan Shuckrow, that he would not authorize the shipment of such samples without following the proper protocol and DOT regulations.

7

34. Shuckrow angrily informed Lambert that they had never previously screened the soil samples, that other radiation safety officers and the off-site laboratory manager had told him that the samples were exempt from DOT regulations, and directed the off-site laboratory to pick up and transport the samples despite Lambert's concerns.

35. That same day, Lambert contacted the DOT which confirmed that the soil samples were not exempt from DOT regulations, and that they were required to be screened for radioactive content prior to transport in order to determine whether the samples are Class 7 Radioactive Material, which is subject to the packaging, labeling, marking, and transport requirements, including appropriate shipping papers, specified by DOT regulations.

36. Lambert informed Shuckrow that DOT had instructed him that the material was <u>not</u> exempt from DOT regulations and needed to be screened. Shortly thereafter, Lambert's employer, Dr. Baker, told Lambert that Shuckrow had just called him to complain about Lambert's work performance, citing alleged problems with Lambert's supervision of his subordinates.

37. Dr. Baker told Lambert that he believed the complaints were the result of a "witch hunt" on the part of Malcolm Pirnie targeting Lambert on account of the safety issues he had raised with regard to the transportation of the soil samples.

38. On July 10, 2006, Lambert met with the Molycorp RSO, George Dawes, to inform him of the dispute with Dr. Shuckrow over whether the samples were subject to DOT regulations. Lambert also requested to know if there were complaints about his work performance that were serious enough that he should consider withdrawing the

8

recent offer he had made to purchase a home in the area. Dawes indicated that there were no issues with Lambert's work performance.

39. On July 17, 2006, the project started moving potentially contaminated soil to a separate staging area, using heavy equipment to level the staged soil, as well as crushing concrete in another location, all in posted radioactive material areas at the Site.

40. On Wednesday, July 19, 2006, Dr. Baker e-mailed Lambert and informed him that Shuckrow was satisfied with the outcome of previous complaints but that he now had an issue with the number of hours Lambert was billing on the project.

41. As the excavation process generated excessive amounts of dust, Lambert strongly urged that it proceed at a pace slow enough that the single water truck available could keep up with suppressing/minimizing the generation of potential airborne radioactive material.

42. Officials from Molycorp, Shaw, and Malcolm Pirnie refused to control the pace of work activities or add additional water suppression equipment as urged by Lambert's proposed safety protocol.

43. Consequently, on or about July 20, 2006, Lambert directed removal of all ground personnel from the immediate work areas and limited work area access to equipment operators within enclosed, ventilated equipment cabs.

44. Shortly thereafter, management personnel from Molycorp and Malcolm Pirnie met and concluded that Lambert should be removed from the project site because of his complaints and concerns.

45. They communicated their decision to Dr. Baker, and directed him to remove Lambert from the Washington Project.

46. On July 24, 2006, Dr. Baker, acting at the urging of Molycorp and Malcolm Pirnie, terminated Lambert.

### COUNT I - Wrongful Discharge against Defendant ERG

47. Paragraphs 1 through 46 herein are incorporated by reference.

48. ERG terminated Lambert because he raised radiological safety concerns including NRC safety violations with the Defendants and the NRC and DOT and because of his adherence and enforcement of such safety regulations.

49. ERG's action in this regard violates Section 211 of the Energy Reorganization Act (ERA) of 1974 (42 U.S.C. § 5851).

50. Lambert's termination because of his complaints about NRC safety violations and his statutory adherence to safety standards violates a clearly defined mandate of Pennsylvania public policy as embodied in the Pennsylvania Health and Safety Act, 43 P.S. § 25-1 *et seq.*, and the Pennsylvania Worker & Community Right to Know Act, 35 P.S. § 7301 *et seq.,* and the Pennsylvania Radiation Protection Act, 35 P.S. § 7110.101 *et seq.*

51. As a result of Defendant ERG's actions, Lambert has suffered economic damages exceeding $75,000 in lost wages and other emoluments of employment.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment for Plaintiff and against Defendant ERG as follows:

A. Find that the termination of Lambert by Defendant ERG constituted wrongful discharge because it violated a clear mandate of Pennsylvania public policy;

B. Award Lambert:

10

(i) All wages, benefits, perquisites and any other emoluments of employment which he has lost as result his termination;

(ii) Compensatory damages for emotional stress and mental anguish; and

(iii) Such other relief as this Court deems proper.

## COUNT II - Tortious Interference With Actual and Prospective Contractual Relations Against Defendants Malcom Pirnie and Molycorp

52. Paragraphs 1 through 51 herein are incorporated by reference.

53. Lambert had a contract, contractual relations and/or a prospective contract with ERG.

54. Defendants Malcolm Pirnie and Molycorp acted either individually or in concert with the intention of harming Lambert's contractual relations and prospective contractual relations with ERG by demanding his removal from the Washington Project.

55. Defendants Malcolm Pirnie and Molycorp had absolutely no privilege or justification to interfere with Lambert's contractual relations and prospective contractual relations with ERG.

56. As a result of the conduct of Defendants Malcolm Pirnie and Molycorp acting individually or in concert, Lambert suffered actual legal damage.

57. In addition, Defendants' actions show malice, wanton conduct and bad faith, such that the imposition of punitive damages is appropriate.

58. As a result of Defendants' actions, Lambert has suffered economic damages exceeding $75,000 in lost wages and other emoluments of employment.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment for Plaintiff and against Defendants Malcolm Pirnie and Molycorp as follows:

11

    A.    Find that the interference by Defendants Malcolm Pirnie and Molycorp, acting either individually or in concert, in instructing ERG to terminate Lambert's employment caused Lambert to suffer actual legal damages; and

    B.    Award Lambert:

        (i)    All wages, benefits, perquisites and any other emoluments of employment which he has lost as result of his termination;

        (ii)    Compensatory damages for emotional stress and mental anguish;

        (iii)    Punitive damages; and

        (iv)    Such other relief as this Court deems proper.

### COUNT III – Civil Conspiracy Against Defendants Malcolm Pirnie and Molycorp

59.    Paragraphs 1 through 58 herein are incorporated by reference.

60.    Defendants Malcolm Pirnie and Molycorp acted with a common purpose to intentionally and tortiously interfere with Plaintiff's contractual relations with ERG because of his complaints of safety concerns and violations made to all Defendants, the NRC and the DOT.

61.    Defendants Malcolm Pirnie and Molycorp committed an overt act done in furtherance of the common purpose of interfering with Plaintiff's contractual relations with ERG by instructing ERG to remove him from the Washington Project and terminate Plaintiff's employment.

62.    Defendants' actions in this regard show malice, wanton conduct and bad faith.

63. As a result of this conduct, Plaintiff suffered actual legal damages, including lost wages, other benefits of employment, emotional distress, and consequential damages.

64. As a result of Defendants' actions, Lambert has suffered economic damages exceeding $75,000 in lost wages and other emoluments of employment.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment for Plaintiff and against Defendants as follows:

A. Find that the Defendants Malcolm Pirnie and Molycorp unlawfully conspired to interfere with Lambert's present and prospective contractual relations with ERG, causing Lambert to suffer actual legal damages; and

B. Award Lambert:

 (i) All wages, benefits, perquisites and any other emoluments of employment which he has lost as result his termination;

 (ii) Compensatory damages for emotional stress and mental anguish;

 (iii) Punitive damages; and

 (iv) Such other relief as this Court deems proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

November 16, 2007

s/Edward J. Feinstein
Edward J. Feinstein, Esquire
efeinstein@stemberfeinstein.com
PA I.D. No. 29718

Stember Feinstein Doyle
& Payne, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone (412) 281-8400
Attorney for Plaintiff